## TREMAINE *v.* STATE

No. 42475 January 14, 1963 148 So. 2d 517

*Coleman Clements,* Rolling Fork; *Howard Dyer, Jr.,* Greenville, for appellant.

*G. Garland Lyell, Jr.,* Asst. Atty. Gen., Jackson, for appellee.

McGehee, C. J.

The appellant was indicted, tried, convicted, and sentenced to serve a term of three years in the state penitentiary for an alleged attempt to rape the prosecutrix, in that he "did then and there lay hold of the body of the said * * * , and did then and there lift and raise up the housecoat (or robe) worn by said * * * , with the felonious intent, design and endeavor, her, the said * * * , violently, knowingly, forcibly and against her will, feloniously to ravish and carnally know."

On the occasion complained of, at about 2:30 in the afternoon, the appellant is alleged to have gone to a trailer court where a Mrs. Patricia Crowe resided, under the pretense of wanting to locate a person who had some horses for sale. He soon left the trailer court about two miles from Greenville in Washington County, Mississippi, and went about a half mile to the home of the prosecutrix. When he arrived at the home of the prosecutrix, driving a "salmon-pink 1955 Ford", he inquired of her where he could locate the owner of the horses that were for sale, and requested of her that he be permitted to use her telephone. At the time he arrived at the home of the prosecutrix she was in bed with her three year old daughter, trying to get the child to sleep. Upon hearing the doorbell ring, and being concerned about the child's nap, she noted that it was then 2:30 P. M. She went to the door and found the appellant. She says that he had a piece of what looked like newspaper with a name written on it similar to a piece of

paper furnished and described by Mrs. Crowe, and that he made inquiry about the residence of the person whose name was on the paper. The prosecutrix did not know where the person lived but allowed the appellant to use her telephone in her kitchen. He said, "I am looking for a horse farm that is next to a trailer court." She invited him to "come out in the yard, and I think I can show you how to get there." She and the appellant went out into the yard and she then said to him, "Go straight on down this road and I am sure you will run into the place where the horses are". And he said, "No, I have already been down there and I have asked and they don't know where this person lives." She then undertook to give him further instructions as to where he might find the owner of the horses, and then when she went back into her house she says that he followed her, and she asked him "What do you want?" He then said, "I am going to get a bucket, my radiator is leaking." She then said to him, "Why don't you take my hose and fill your car up with water; I don't even have a bucket." She then went into the house and closed the door, and since she was expecting her mother-in-law to come to baby-sit for her, she called her and said, "I can't seem to get rid of this boy, and I am just a little bit nervous. Hurry on out here."

She says that when she got through phoning appellant was back at the door and "I went back to the side door and I said, 'What do you want?' and he said, 'I left my lighter in your kitchen'." She testified that she then told him, "You did not. I have been in the kitchen, the lighter is not in there, and he just kept on, you know coming up to me and everything, and said he had just paid so much money for it (meaning the lighter) and had to find it; so he went in my kitchen and looked on the stove and in the chair and it was not there." She says that he then started down the hall to the room where her children were asleep and that she said, "You can

not go back there. You have not even been back there; you could not possibly have left the lighter back there." She testified that he then asked her if her house was air-conditioned and she told him, yes. And when she was walking from her kitchen into the dining room, he started walking toward her, "and grabbed my bathrobe and yanked it up, and then I don't know what I did, but he grabbed both of my arms like this (indicating) and — you know — held me like that (indicating); so I said, 'My children and my mother are back there asleep'." That she then somehow broke away from him and "went out the back door by the side of my car and he ran around in front of me and I said 'you better go on because I am going to scream and I am going to get your license and report you to the police'." And he said, "If you scream, I will silence you in one blow". She says that she then saw a car coming and said, "There comes a car down Bayou Road, and I have already got your vehicle number; so he put his hand over the vehicle inspection number, and I said 'you needn't do that because I already have it memorized'."

The persons whom she saw coming in a car were a Mr. Haney and Dr. Clare Allen, and, at the trial, they identified the appellant as being the person that they saw leave her house in the "salmon-pink Ford automobile".

We think that under the foregoing facts and circumstances there is a strong probability that appellant intended at the time to use force against the prosecutrix, but under the cases hereinafter referred to we do not think there is any proof of any overt act in that behalf.

It will be noted that the prosecutrix did not contend that the appellant undertook to lure her into a bedroom or to otherwise molest her in any manner. She does not contend that he made any lewd or lascivious remark to her or committed any overt act which would amount

to an attempt to rape. We quote the following from her testimony:

"Q. Then he came back into the house and you say that is when he grabbed your housecoat? A. Yes. Q. And he pulled it up? A. Yanked it up. Q. And then he grabbed both of your arms? A. Both of them (indicating on arms). Q. You are indicating your forearm? A. Yes. Now, Mrs. * * *, other than that, physically did he do anything to you? A. He only, like I said, stayed close, where other people who used my 'phone didn't ever come up close to me — And then I forgot when we got out in the yard he kept saying, 'Get back in the house.' Q. Yes, but up to this point - - - A. No. Q. Did he have a deadly weapon of any kind? A. Not that I noticed. Q. Did he exhibit a pistol? A. No. Q. Did he exhibit a knife? A. No. Q. Did he threaten your life? A. Not in words. Q. Did he choke you? A. No. Q. Then you tell the jury that the most he did, from a physical standpoint, was he grabbed your housecoat, lifted it and dropped it immediately? A. No, he grabbed it up, and I guess I was trying, I am sure, to get it down and — you know — to knock it down, and that was when he grabbed me, and it fell when he grabbed my arms; my housecoat fell back down — but he didn't turn it loose. Q. That is all that was done? A. Yes."

In the case of Green v. State, 67 Miss. 356, 7 So. 326, where the prosecuting witness was riding a horse along a public road and stopped at a train crossing, she saw a negro man near. As she proceeded on her way, the negro ran after her and caught hold of her riding skirt. She screamed and struck her horse and got away from him. She later positively identified the negro and he was convicted of the crime of attempted rape and appealed to this Court, where it was held: "The evidence is insufficient to support the verdict of the jury. We may conjecture the purpose of the defendant to have been to commit a rape, but, on the facts disclosed, it is

conjecture only, and not an inference reasonably drawn from the evidence. The probabilities may be greater that a rape was intended rather than robbery or murder, but mere probability of guilt of a particular crime, and that, too, springing more from instinct than from proved facts, cannot support a verdict of guilty. There is great danger of improper convictions in cases of this character, and, while the court should not for that reason invade the province of the jury, the danger admonishes us of the necessity of standing firmly upon the right and duty of proper supervision and control of them." This was during the year 1890, when it was almost inconceivable that a negro man would catch hold of the clothing of a white woman under such circumstances for any purpose other than to attempt the crime charged. Nevertheless his conviction was reversed.

In the case of Austin v. State, 48 So. 817 (Miss.), this Court said among other things: "Looking carefully through the whole record, we are constrained to hold that the testimony in this case falls short of showing an attempt to commit rape. There is no satisfactory evidence of any purpose on the part of appellant to use such violence as might be necessary to overcome resistance to such an attempt. We do not think it would serve any useful purpose to detail the evidence."

In the case of Spurlock v. State, 158 Miss. 280, 130 So. 155, the record revealed that the prosecutrix, a deaf mute, was alone with her baby in her home at night, when a negro man broke into the back door, appeared in her room and picked up a broom and threatened her with it. He caught her by the throat, choked her, and when she screamed he opened his knife. When she screamed again, he released her and ran away. The man was later captured, and identified by the prosecutrix. He was indicted, tried and convicted for an attempt to rape. This conviction was reversed and remanded, and in the course of its opinion the Court set forth at con-

siderable length its reasons for holding that the case should be reversed and remanded.

See also the case of State v. Lindsey, 202 Miss. 296, 32 So. 2d 876.

 ██ Under the holding of this Court in the cases hereinbefore cited we have concluded that the evidence in the case at bar was insufficient to warrant the conviction of the accused in this case, and that therefore the cause should be reversed and a judgment rendered here in favor of the appellant.

Reversed and judgment here for appellant.

*Lee, P. J., McElroy, Rodgers and Jones, JJ.,* concur.