932 So.2d 850 (2006)
Bruce CARTER, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2004-KA-01639-COA.
Court of Appeals of Mississippi.
January 31, 2006.
Rehearing Denied May 2, 2006.
*851 Melvin G. Cooper, Biloxi, attorney for appellant.
Office of the Attorney General by John R. Henry, attorney for appellee.
EN BANC.
*852 GRIFFIS, J., for the Court.
¶ 1. Bruce Carter appeals his conviction of attempted kidnapping. We find no error and affirm.

FACTS
¶ 2. On Sunday December 15, 2002, at around 2:00 p.m., Shanta Marie Joseph left her home and walked toward her grandmother's house, which was approximately four or five blocks away. Carter, driving a black Mustang, pulled up beside Joseph and began talking to her. Carter attempted to entice Joseph into his car. Carter told Ms. Joseph that "you just need to loosen up a little bit, the only thing you need is a little attention," and "what you need to do is just let somebody like me do this and that for you." As will be discussed in more detail below, Carter made several lewd and sexually specific comments toward Ms. Joseph. She refused to get in Carter's car, and she continued her walk toward her grandmother's house.
¶ 3. Carter parked his car, got out and approached Ms. Joseph. She attempted to avoid Carter by crossing to the other side of the street. Carter followed her and grabbed her arm. She jerked her arm free of Carter's grasp and fled to her grandmother's house where she called the police.
¶ 4. Carter was charged and convicted of attempted kidnapping. The circuit court sentenced him to serve ten years in the custody of the Mississippi Department of Corrections. After the court denied Carter's motion for new trial or judgment notwithstanding the verdict, he perfected his appeal. Carter asserts four issues for our consideration:
1. Was the evidence of attempted kidnaping sufficient to permit the jury to pass upon Carter's guilt? In other words, was the verdict contrary to the weight of the evidence?
2. Did the trial court err in excluding juror no. 12?
3. Did the trial court err in denying relief on Carter's motion for psychological evaluation?
4. Did the trial court err in admitting evidence that Carter was identified in a photographic lineup?

ANALYSIS

1. Was the evidence of attempted kidnaping sufficient to permit the jury to pass upon Carter's guilt? In other words, was the verdict contrary to the weight of the evidence?
¶ 5. The critical inquiry on the issue of legal sufficiency is whether the evidence shows "beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed." Bush v. State, 895 So.2d 836, 843(¶ 16) (Miss.2005) (citing Carr v. State, 208 So.2d 886, 889 (Miss.1968)). Where the evidence fails to meet this test, it is insufficient to support a conviction. Id. The relevant question, after viewing the evidence in the light most favorable to the prosecution, is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id.
¶ 6. Carter was indicted for attempted kidnapping. Mississippi Code Annotated Section 97-3-53 (Rev.2000) provides for the crime of kidnapping:
Any person who shall without lawful authority forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such person to be secretly confined or imprisoned against his or her will, . . . shall, upon conviction be imprisoned for life in the state penitentiary if the punishment is so fixed by the jury in its *853 verdict. If the jury fails to agree on fixing the penalty at imprisonment for life the court shall fix the penalty at not less than one (1) year nor more than thirty (30) years in the state penitentiary.
Section 97-1-7 (Rev.2000) provides for the punishment of attempt:
Every person who shall design and endeavor to commit an offense, and shall do any overt act toward the commission thereof, but shall fail therein, or shall be prevented from committing the same, on conviction thereof, shall, where no provision is made by law for the punishment of such offense, be punished as follows: If the offense attempted to be committed be capital, such offense shall be punished by imprisonment in the penitentiary not exceeding ten years; if the offense attempted be punishable by imprisonment in the penitentiary, or by fine and imprisonment in the county jail, then the attempt to commit such offense shall be punished for a period or for an amount not greater than is prescribed for the actual commission of the offense so attempted.
Hence, courts interpret "attempt" to mean the intent to do something, and some actual effort to put the intent into effect. Murray v. State, 403 So.2d 149, 152 (Miss. 1981). The "gravamen" of the offense of an attempt to commit a crime is found in the statutory requirement that an overt act toward the crime be committed and the defendant be prevented from its consummation. State v. Lindsey, 202 Miss. 896, 899, 32 So.2d 876, 877 (1947).
¶ 7. Carter argues that his conduct was not sufficient to prove the "overt act" element of attempt. Carter relies on three decisions. First, in Green v. State, 67 Miss. 356, 356, 7 So. 326, 326 (1890), the supreme court ruled that the overt act requirement was not met on a charge of attempted rape when a man "caught hold" of the presumed victim's riding skirt, who was able to "strike her horse" and ride away. The court held that "[w]e may conjecture the purpose of the defendant to have been to commit a rape, but on the facts disclosed, it is conjecture only, and not an inference reasonably drawn from the evidence." Id., 7 So. at 326.
¶ 8. Next, in State v. Lindsey, the supreme court held that the facts were insufficient to support a finding of attempted rape when a man chased a woman through a "lonesome and secluded place in the country," and was prevented from committing any offense because the woman reached someone she knew. Lindsey, 202 Miss. at 901-02, 32 So.2d at 878.
¶ 9. Finally, in Tremaine v. State, 245 Miss. 512, 516, 148 So.2d 517, 518 (1963), a man obtained entry into a woman's home, under false pretenses, raised her bathrobe, and grabbed her. He even told her that he would "silence [her] in one blow" if she screamed. Id., 148 So.2d at 519. The court held that although there was a strong possibility that the man was going to use force against the victim, based on these facts and court precedent, there was insufficient evidence to satisfy the overt act requirement of attempted rape. Id., 148 So.2d at 519.
¶ 10. The State counters with the recent decision in Hersick v. State, 904 So.2d 116 (Miss.2004). Larry Hersick sat outside a Wal-Mart when an eleven-year-old girl ran by. Id. at 120(¶ 1). Hersick "grabbed the girl by her upper right arm and pulled her a distance of about five to ten feet into the parking lot. The girl jerked away from Hersick and ran" to safety. Id. Hersick was tried and convicted of attempted kidnaping. Id. at (¶ 2). On appeal, Hersick claimed that his conviction was against the overwhelming weight of the evidence. Id. at 120-21(¶ 2). The *854 court rejected this argument and found that the evidence supported a verdict of attempted kidnaping. Id. at 127 (¶¶ 43-44).
¶ 11. In Jenkins v. State, 507 So.2d 89 (Miss.1987), the court affirmed the attempted kidnaping conviction of Douglas Jerome Jenkins. Jenkins and another man attempted to forcibly seize and confine grocery store patron as he was entering his car. Id. at 90. Jenkins and his accomplice went to a grocery store with the intent to rob the store. Id. at 90-91. When their plan fell through, they left the store. Id. at 91. Jenkins and his accomplice then turned their intentions toward Ira Kynerd, a patron of the store who was in the parking lot. Id. However, this crime was thwarted when "Kynerd foiled the attempt by refusing to get into the car and simply walking away  in a public parking lot in broad open daylight. . . ." Id. at 93. Nevertheless, the supreme court affirmed Jenkins' conviction of attempted kidnaping and held that:
while we must state in candor that this is anything but the strongest case for the prosecution we have seen, the evidence was such that, when considered under our familiar standard of review, we have no authority to disturb the jury's finding that the prosecution had proved each and every element of the offense of attempted kidnapping.
Id.
¶ 12. In this case, the evidence is very similar to that presented in Hersick and Jenkins. According to the victim, Ms. Joseph, Carter pulled up beside her while she was walking home. He engaged her in a conversation that turned lewd and sexually suggestive. He began by repeatedly offering her a ride, and she declined each time. Carter then began to make lewd sexual advances. He asked her to engage in sexual relations with him, and she declined. Carter then parked his car, got out and chased the victim down the street. Carter eventually grabbed the victim's arm. The victim testified that, "I was scared he was going to put me back in his car and take me somewhere. I've never been put in [such a] predicament before, never."
¶ 13. Following Hersick and Jenkins, we find that the evidence was sufficient to establish an overt act toward the commission of a crime, i.e., attempted kidnapping. Therefore, we find no merit to this issue.

2. Did the trial court err in excluding juror no. 12?
¶ 14. Next, Carter contends that the trial court should have granted his Batson challenge, based on racial discrimination, as to juror no. 12. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) is a landmark case in jury selection. Batson established a three-part test for a defendant to make out a prima facie case of purposeful discrimination in jury selection. The defendant must show:
(a) that he is a member of a cognizable racial group;
(b) that the prosecutor exercised peremptory challenges to remove from the venire members because of the defendant's race; and
(c) that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.
Id. at 96, 106 S.Ct. 1712. Once the defendant does so, the prosecutor is then required to provide a non-racial reason for exercising the challenge. Id. at 97, 106 S.Ct. 1712. The court may accept the reasons given and allow the challenge.
*855 ¶ 15. The State's race-neutral reason was that the juror knew the defense attorney as a community figure and had previously had contact with the defense attorney. Further, the State claimed that the juror had his eyes closed during half of the voir dire examination. In Thomas v. State, 818 So.2d 335, 345(¶ 32) (Miss.2002), the court held that the fact that a venireman knows or knows of the defense attorney can be considered as a race-neutral reason when coupled with other race-neutral reasons for the challenge. In Burnett v. Fulton, 854 So.2d 1010, 1014(¶ 10) (Miss. 2003), the court held that "[i]nattentiveness, demeanor, sleeping during voir dire, lack of eye contact, educational level and hostility . . . have all been held by this Court to be race neutral reasons in keeping with Batson."
¶ 16. Carter's counsel attempted to rebut the fact that the juror knew of him and had previously had contact with him. However, Carter's counsel did not attempt to rebut the State's claim of inattentiveness or sleeping during voir dire. Instead, Carter's brief to this Court claims that juror no. 12 was the only African American who could have served on the jury. However, the record simply does not provide us with the racial makeup of the jury. The record is inadequate for us to review a Batson challenge to the entire jury. Regardless, Carter's counsel did not make a similar challenge before the trial court. We find no error in the exclusion of juror no. 12.

3. Did the trial court err in denying relief on Carter's motion for psychological evaluation?
¶ 17. Next, Carter argues that the court should have granted his motion for psychiatric evaluation. Carter reasons that Mississippi Code Annotated Section 99-13-11 (Rev.2000) is intended to avoid placing an accused on trial unless he is capable of conducting a rational defense by intelligently conferring with counsel. Frierson v. State, 250 Miss. 339, 165 So.2d 342 (1964).
¶ 18. Carter's counsel told the trial court that he first learned Carter was seeing a psychiatrist the day before the trial. Counsel also argues that "it was difficult to penetrate" Carter. The court denied the motion as untimely.
¶ 19. Mississippi Code Annotated Section 99-13-11 (Rev.2000) provides:
In any criminal action in the circuit court in which the mental condition of a person indicted for a felony is in question, the court or judge in vacation on motion duly made by the defendant, the district attorney or on the motion of the court or judge, may order such person to submit to a mental examination by a competent psychiatrist or psychologist selected by the court to determine his ability to make a defense; provided, however, any cost or expense in connection with such mental examination shall be paid by the county in which such criminal action is pending.
In Gammage v. State, 510 So.2d 802, 803 (Miss.1987), the supreme court held that a "defendant not competent to stand trial is one who does not have sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, or does not have a rational as well as a factual understanding of the proceedings against him." (citing Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); Caylor v. State, 437 So.2d 444, 447 n. 1 (Miss.1983)).
¶ 20. Here, Carter failed to present sufficient evidence to support his claim that a mental examination was required. The simple fact that Carter was seeing a psychiatrist does not require that the trial court find that he was incapable of a rational *856 defense or order a mental examination. We find no merit to this issue.

4. Did the trial court err in admitting evidence that Carter was identified in a photographic lineup?
¶ 21. Carter's final issue is that the photographic lineup should have been excluded. Carter claims that the lineup was improperly suggestive because his photo was the only picture where the man was wearing a red sweatshirt. When she initially called the police, Ms. Joseph told the dispatcher that the suspect was wearing a red faded sweat suit and was driving a black Mustang.
¶ 22. In Gray v. State, 728 So.2d 36, 68 (¶¶ 159-61) (Miss.1998), the Mississippi Supreme Court held:
The standard of review for suppression hearing findings in a matter of pretrial identification cases is whether or not substantial credible evidence supports the trial court's findings that, considering the totality of the circumstances, in-court identification testimony was not impermissibly tainted. Magee v. State, 542 So.2d 228, 231 (Miss.1989); Nicholson v. State, 523 So.2d 68, 71 (Miss. 1988); Ray v. State, 503 So.2d 222, 224 (Miss.1986). The appellate review should disturb the findings of the lower court "only where there is an absence of substantial credible evidence supporting it." [Emphasis added]. Ray v. State, 503 So.2d at 224. (emphasis in original). Ellis v. State, 667 So.2d 599, 605 (Miss.1995).
The State submits there was substantial credible evidence to support the lower court findings. Even if the pretrial identification of Gray was impermissibly suggestive, the in-court identification does not necessarily have to be excluded. Reliability has been deemed the linchpin in determining the admissibility of the identification testimony. Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Nathan v. State, 552 So.2d 99, 104 (Miss.1989). The lower court must determine from the totality of the circumstances if the identification was reliable even though the confrontation procedure may have been suggestive. York v. State, 413 So.2d 1372, 1377-78 (Miss.1982).
In determining whether this standard has been met there are certain factors that must be considered.
1. Opportunity of the witness to view the accused at the time of the crime;
2. The degree of attention exhibited by the witness;
3. The accuracy of the witness' prior description of the criminal;
4. The level of certainty exhibited by the witness at the confrontation;
5. The length of time between the crime and the confrontation.

Neil v. Biggers, 409 U.S. 8, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); York, 413 So.2d at 1383.
¶ 23. After reviewing the lineup, we conclude that the trial court was correct to find that it was not unduly suggestive. Each of the six photographs depict men who were: (1) black, (2) wearing a red shirt, (3) of approximately the same age, and (4) had no identifying marks, numbers, or other characteristics. We find that the identification process was not impermissibly suggestive. Therefore, it is not necessary that we consider the Biggers factors. We find no merit to this issue.
¶ 24. Accordingly, we affirm Carter's conviction of attempted kidnapping.
¶ 25. THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT OF CONVICTION OF ATTEMPTED KIDNAPPING AND SENTENCE OF TEN YEARS IN THE *857 CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HARRISON COUNTY.
LEE AND MYERS, P.JJ., CHANDLER, BARNES, ISHEE, AND ROBERTS, JJ., CONCUR. KING, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY IRVING, J. SOUTHWICK, J., NOT PARTICIPATING.
KING, C.J., Dissenting:
¶ 26. Because I believe the evidence from this case is insufficient to sustain a conviction for attempted kidnaping, I dissent from the majority opinion herein.
¶ 27. I believe that the majority correctly cites the law of this State. However, I believe that it incorrectly applies that law to the facts of this case. The majority finds this case to be factually similar to and controlled by the cases of Hersick v. State, 904 So.2d 116 (Miss.2004), and Jenkins v. State, 507 So.2d 89 (Miss.1987). In Hersick, the intended victim, who was eleven years of age, was grabbed and pulled to another location. In Jenkins, an effort was made to force the intended victim into a car. Those facts are not present in the case sub judice. In this case, no one was pulled to another location, and there was no effort to force anyone into a vehicle.
¶ 28. The majority states that, "Carter then parked his car, got out and chased the victim down the street." This statement is a conclusion by the majority, but is not supported by the testimony contained in the record before this Court. Because this is a fact-driven case, I believe it appropriate to include herein the relevant portions of the testimony of the alleged victim:
[PROSECUTOR]: As you're walking that afternoon tell the jury what happened to you?
[JOSEPH]: A black Mustang pulled up beside me. He was coming from off the street where the barber shop is at. The first thing that he said was, "How you doing?" I said, "Fine." He was like, "It's a nice day out here." I was like, "Yeah, I know." He asked did I need a ride. "No, thank you." He was like, "Well I'm just being nice. It's a nice day. I know you don't want to walk." I was like, "I don't mind walking."
Q: During this time that you are having conversation it sounds like you are stopped or are you facing each other; what's going on?
A: He was in the car, I was still walking down the sidewalk. He was in the car like right there by me. I'm on the sidewalk and the car is like right there, like in the middle of the road, not on my side where I'm at but in the middle of the road.
Q: Go ahead Ms. Joseph, what happens then?
A: He was driving slow. He was like, "Are you sure?" I said, "I'm positive." He was like, "You just need to loosen up a little bit." I was like, "No, I'm fine." As I further walked to go to my grandma house he pulled the car up by the pawn shop. He was like, "You just need to loosen up. The only thing you need is a little attention." And I kept going. He was like, "The only thing, you know, is for somebody to do," what he said, "and you will be fine. You just need to loosen up a little bit." And I was like, "No." He parked the car by the pawn shop, got out. While he got out, I was crossing the street. By the time he got out he walked to where I was at and grabbed my arm on the left side. I snatched back and ran. I can say  I'm *858 not going to say he ran, he walked just a little bit, but it was speed walking. He turned back around and got in his car  and he went back and got in his car and he left. The way he went is the same way that I was running. I did not stop running until I got to my grandma house. By the time I got to my grandma house I called the police. I was so scared. I walked to my grandma house everyday. I've never in my life had somebody come up to me and say some of the stuff he said or do anything like that. I didn't know if this man was going to hurt me or what, never.
In her continued description of this event on direct examination, Ms. Joseph later testified:
[PROSECUTOR]: At the point that you see him pull ahead and stop, I believe you said in the pawn shop parking lot which is at the corner of Judge Sekul and Forrest and he gets out of the car, what are you thinking?
A: What is this man doing. I just told him no.
Q: Were you concerned?
A: A little bit I was, but I'm like it's broad daylight. I know he don't have  I know he's not going to do nothing that stupid.
Q: Then as he approached you and you moved over to the other side of the street and you're very close to each other at the point what happened?
A: I was so scared. When he came and grabbed my arm I snatched away and I ran.
I didn't give him time enough to say anything else, I ran.
Q: When you say that he didn't say anything, was he still making those same comments to you?
A: By the time he parked the car  it's just basically in the car is when he was talking.
Q: And when he grabbed your arm was he going to  what was he going to do?
A: I was scared he was going to put me back in his car and take me somewhere. I've never been put in [that] predicament before, never.
¶ 29. Finally, in an effort to establish an attempted kidnaping, the prosecution elicited the following testimony in its direct examination.
[PROSECUTOR]: How is it that you were able to escape? Tell us about the struggle there?
A: When he got out of the car he walked towards me, I started walking a little faster. By the time he got to where I was at and grabbed my arm I snatched away, kicked and started running.
THE COURT: I'm sorry. You snatched away and what?
A: I snatched away and like, you know, just started running, just like kicked and I ran. I did not stop running until I got to my grandma house.
¶ 30. Under cross-examination, Ms. Joseph testified:
[DEFENSE ATTORNEY]: Okay. And this individual that you stated earlier exited from his car, got out of his car and approached you, am I correct.
A: Yes, sir.
Q: And I believe you testified earlier that this individual grabbed your arm, am I correct?
A: Yes, sir.
Q: What arm; left or right?
A: Left.
Q: Left arm. And I believe you testified that you immediately snatched away?

*859 A: Yes, sir.
Q: Is that correct?
A: Yes, sir.
Q: So there was no fighting and kicking, am I correct?
A: No. No fighting.
Q: Thank you. And after that individual  after you immediately snatched away from this individual what happened?
A: He walked up a couple of feet but he turned back around and got in his car and drove off.
Q: And you went in your direction?
A: In my direction.
¶ 31. Later during cross-examination, Ms. Joseph testified:
[DEFENSE ATTORNEY]: Ms. Joseph, when the person made contact with you, grabbed you [sic] left arm, did that person ever pull you?
A: He grabbed my arm like this, I snatched away and I ran.
Q: Okay. That was the extent of the contact?
A: Yes, sir.
¶ 32. Finally on recross-examination, Ms. Joseph testified:
[DEFENSE ATTORNEY]: So actually when he grabbed your left right (sic) arm and you snatched away he never got a chance to seize you because you snatched away, am I correct?
A: He seen me.
Q: I beg your pardon.
[PROSECUTOR]: Objection 
THE COURT: Hold up just a second. What's your objection?
[PROSECUTOR]: That calls for a legal conclusion.
THE COURT: That's a factual question. I will overrule it.
[DEFENSE ATTORNEY]: When the person  you stated that Mr. Carter snatched your left arm, my question is that when he snatched your left arm, according to your testimony, and you snatched back he never got an opportunity to seize you, am I correct?
A: Yes, sir.
Q: And also he never confined you no where, am I correct because you snatched back?
A: Yes, sir.
¶ 33. Carter's conduct was highly questionable, boorish, and indeed reprehensible. But it was not conduct which exhibited an overt act as is legally required to establish attempted kidnaping. Carter's indictment stated that an overt act was committed when he "did feloniously, willfully, and without lawful authority forcibly seize and confine Shanta Marie Joseph with the intent to cause the said Shanta Marie Joseph to be secretly confined or imprisoned against her will . . ." According to Joseph's own testimony, Carter did nothing other than grab her arm. Because Joseph immediately snatched her arm away, the grabbing, at most, would have lasted only a fraction of a second.
¶ 34. When the facts and reasonable inferences considered in a challenge to the sufficiency of the evidence point in favor of the defendant on any element with such force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty, the proper remedy is to reverse and render. Bush v. State, 895 So.2d 836, 843(¶ 16) (Miss.2005). The facts of this case do not establish the overt act requirement for attempted kidnaping, nor do they support a reasonable inference that Carter attempted the kidnaping of Joseph. Therefore, Carter's conviction should have been reversed and rendered.
IRVING, J., JOINS THIS SEPARATE OPINION.