# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-00813-COA

JOANIE TIACHELLA CALLOWAY A/K/A                    APPELLANT
JOANIE CALLOWAY A/K/A JOANNIE
CALLOWAY

v.

STATE OF MISSISSIPPI                                             APPELLEE

DATE OF JUDGMENT:              05/09/2017
TRIAL JUDGE:                   HON. ROBERT B. HELFRICH
COURT FROM WHICH APPEALED:     FORREST COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:       OFFICE OF STATE PUBLIC DEFENDER
                               BY: BENJAMIN SUBER
                                   GEORGE T. HOLMES
ATTORNEY FOR APPELLEE:         OFFICE OF THE ATTORNEY GENERAL
                               BY: KAYLYN HAVRILLA McCLINTON
DISTRICT ATTORNEY:             PATRICIA A. THOMAS BURCHELL
NATURE OF THE CASE:            CRIMINAL - FELONY
DISPOSITION:                   AFFIRMED - 03/05/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

EN BANC.

GREENLEE, J., FOR THE COURT:

¶1.     A Lafayette County jury in this Forrest County Circuit Court case found Joanie

Calloway guilty of being an "attempted accessory after the fact" of capital murder, in

violation of Mississippi Code Annotated sections 97-1-5 and 97-1-7 (Rev. 2014) and of

hindering the prosecution, in violation of Mississippi Code Annotated section 97-9-103 (Rev.

2014).  The trial court sentenced Calloway to consecutive sentences of twenty years for

attempted accessory after the fact and five years for hindering the prosecution, to be served

in the custody of the Mississippi Department of Corrections (MDOC). Calloway appeals, arguing (1) the evidence was insufficient to support her conviction for attempted accessory after the fact, (2) cumulative errors in her trial require reversal, and (3) her sentence for attempted accessory after the fact was unconstitutionally disproportionate. We find no error and affirm Calloway's convictions and sentences.

## FACTS

¶2.     At approximately 7:30 p.m. on May 9, 2015, Hattiesburg Police Department Officer Benjamin Deen stopped Calloway's vehicle during a routine traffic stop, and his dash camera automatically switched on. Calloway was traveling with three passengers in her car, who were later identified as her boyfriend, Marvin Banks, her friend, "Loco," and her son. Banks sat in the front-passenger seat, and the other two passengers sat in the back of the car. After Officer Deen made contact with Calloway, he called for backup. Officer Liquori Tate responded.

¶3.     During trial, the video from Officer Tate's dash camera was played for the jury and admitted into evidence. In the video, Calloway and Banks can be seen moving around in the car. Officer Deen informed Officer Tate that Calloway's license was suspended and that Calloway's front-seat passenger was putting something underneath his seat. Officers Deen and Tate ordered Calloway and Banks out of the vehicle to get them away from whatever had been stashed under the font seat. In a written statement later given to law enforcement and admitted into evidence, Calloway admitted that, while inside the car, Banks retrieved a gun from his waistline and said he was "going to kill the motherf****rs." Calloway stated that

2

she urged Banks to put the gun away and he placed it under the passenger seat.

¶4. The dash-camera video showed that Calloway complied with Officer Deen's request to exit the vehicle. Banks, however, showed hesitancy in exiting. When Banks eventually stepped outside the car, he grabbed the gun from beneath his seat and shot Officer Dean in the temple. Calloway jumped back in the car. Banks then shot Officer Tate and attempted to shoot Officer Deen's dash camera. From within the car, Calloway held her foot on the break and yelled, "Marvin, get in, Marvin, Marvin." Banks continued shooting, and Calloway drove off. After she did so, "Loco" jumped out of the car.

¶5. Calloway drove until she encountered several barricades blocking the street near an outdoor festival, and then she exited her car. One of the festival goers, Marcia Goff, testified that Calloway and her son approached her. Goff stated that Calloway seemed jittery and very nervous. Calloway stated, "I didn't do nothing. How could this happen to me? I gave these two guys a ride and was going to Fat Boys, and one of them reached over and turned the blinker a different direction, and that's when the police pulled us over." "I didn't know they were gonna shoot at the police," Calloway added. Calloway told Goff she suffers from post-traumatic stress disorder and needed her medication, so Goff told her to sit down. Goff told Calloway that she was going to have to call the police; Calloway replied "yes[,] and an ambulance."

¶6. Goff called 9-1-1 and spoke with an emergency-services operator. During the call, Goff told the operator, "[Calloway] was just a nice person and gave them a ride because they needed a ride." Goff handed Calloway the phone, and Calloway told the operator that she

3

had taken three Seroquil doses, was "f****d up," and could not remember anything. Calloway gave her information to the operator but handed Goff's phone back when the operator began asking questions. The 9-1-1 call was played for the jury and admitted into evidence as Exhibit 10.

¶7. Laron Smith testified that he was a sergeant with the Hattiesburg Police Department in May 2015 and reported to Calloway's location on a dispatch call. Smith said that he encountered Calloway in an outdoor parking lot. She seemed calm and appeared to be crying, but she was not shedding any tears. Smith testified that Calloway told him two black males had jumped inside of her car somewhere on Main Street. Smith identified several locations on Main Street and asked Calloway where she had been near, but she said she did not know. As Smith questioned Calloway further, Calloway looked down as she answered. Smith suspected that Calloway was not being truthful. He read Calloway her *Miranda*[1] rights and placed her in his vehicle in order to take her to the police department for an interview.

¶8. Smith testified that later, after Calloway indicated that she was willing to talk to him, he again read Calloway her *Miranda*[2] rights and asked if she understood. Initially Calloway did not say yes; instead, she stated, "I told that motherf****r not to do that s**t." Smith read Calloway her *Miranda*[3] rights for a third time, and Calloway said she understood her rights. Calloway then told Smith that she and a man named "Cuz" had been driving around the

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] *Id.*

[3] *Id.*

4

Mobile Street area looking to buy marijuana. Calloway claimed she did not know "Cuz's" real name. Calloway said that while they were driving, "Cuz" offered her some cocaine, and she declined because she had taken Seroquel for her bipolar disorder. Smith asked if anyone else had been in the car with Calloway, and she told him that her son and a man named "Loco" had also been with her.

¶9. Smith further testified that Calloway told him she had been pulled over by a police officer. Calloway said that "Cuz" pulled out a gun, she told him to put it away, and he put the gun under his seat. Calloway said that the officer asked for her driver's license and went back to his vehicle to run the identification Calloway gave him. When the officer left, Calloway and "Cuz" began talking. Calloway said "Cuz" pulled the gun back out and said "I'm about to f*****g do this s**t." Calloway told him not to. When the officer returned to Calloway's car, he asked her to step outside. Calloway told Smith that "Cuz" then exited the passenger side of the vehicle and shot the police officer. She also told Smith that she jumped back in her car and fled the scene because she was scared. When Smith asked Calloway to describe "Cuz's" attire, she said that he had been wearing a white shirt, blue jean shorts, and some plaid shoes. In the video from Officer Tate's dash camera, Banks is wearing a dark shirt with colorful designs of blue, pink, and orange. Smith said when he viewed the dash-camera video, he immediately recognized Banks.

¶10. Lieutenant Lotosha Myers-Mitchell of the Hattiesburg Police Department testified that she interviewed Calloway at the police department. Lieutenant Myers-Mitchell stated that

5

she read Calloway her *Miranda*[4] rights, and Calloway agreed to speak with her. Calloway also signed a waiver form, which was admitted into evidence as Exhibit 11. Lieutenant Myers-Mitchell testified that in describing the shooting, Calloway maintained that she did not know the two individuals whom she gave a ride to but had purchased weed from them before. Calloway gave a written statement describing the traffic stop and shooting, which was published to the jury and admitted into evidence as Exhibit 12. At 10:30 p.m., Lieutenant Myers-Mitchell showed Calloway a photo lineup, and Calloway identified one of the men as "Cuz" and wrote "looked like the passenger in my car" on an accompanying form. The lineup and identification form were admitted into evidence as Exhibits 13 and 14.

¶11. Master Sergeant Trent Weeks of the Mississippi Bureau of Investigations also interviewed Calloway. Master Sergeant Weeks testified that Calloway was "very calm" during the interview. He said that Calloway told him she had smoked some marijuana and had taken some bipolar medication prior to the interview. Master Sergeant Weeks said he went over Calloway's *Miranda*[5] rights with her, and Calloway signed and initialed a waiver of her rights. The signed waiver, executed at 12:16 a.m., was admitted into evidence as Exhibit 16. Master Sergeant Weeks explained that the interview was video and audio recorded. The video of Calloway's interview was subsequently received into evidence as Exhibit 17 and published to the jury.

¶12. Early in her interview with Master Sergeant Weeks, Calloway again claimed that she

---

[4] *Id.*

[5] *Id.*

6

picked up "Cuz" and his friend, "Loco," maintaining that she did not know either man's real name. She said that after an officer stopped her vehicle, "Cuz" pulled a gun from his waistline and stated, "we ain't going to jail." Calloway also gave a written statement to Master Sergeant Weeks, in which she claimed that "Cuz" said "he was going to kill the motherf****rs." Her written statement was admitted into evidence as Exhibit 18. Master Sergeant Weeks testified that Calloway only began referring to "Cuz" by his real name after Banks's name was broadcasted over the radio.

¶13. Aaron Thomas, a friend of Banks's also testified for the State. Thomas said that he had known Banks since 1995 or 1996 and grew up across the street from Banks in Hattiesburg. Thomas testified that in May 2015 he and Banks still lived across the street from each other. Thomas said that during that time, Banks and Calloway were in a relationship and had been dating for roughly six months. Thomas said that Calloway knew Banks's real name, knew where he lived, and visited him roughly three to four times a week. Thomas testified that on the day of the shooting, Calloway and Banks had spent time together at his mother's house.

¶14. After the State rested its case, Calloway moved for a directed verdict as to attempted accessory after the fact and hindering the prosecution. The motion was denied. Calloway did not present any witness testimony in her defense. Following jury deliberations, the jury found Calloway guilty of being an attempted accessory after the fact of capital murder and guilty of hindering the prosecution in the first degree. Calloway subsequently filed a motion for a judgment notwithstanding the verdict or, in the alternative, a new trial. The trial court

7

denied Calloway's motion, and she has timely appealed.

## DISCUSSION

### I.    Sufficiency of the Evidence

¶15.    On appeal, Calloway argues the evidence was insufficient to support her conviction for Count One (attempted accessory after the fact of capital murder) and Count Two (hindering the prosecution in the first degree).

¶16.    When reviewing the sufficiency of the evidence, "[t]he relevant question is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Green v. State*, 2017-KA-00770-SCT, 2018 WL 5076318, at *3 (¶12) (Miss. 2018) (quoting *Hearn v. State*, 3 So. 3d 722, 740 (¶54) (Miss. 2008)). "Under this inquiry, all evidence supporting the guilty verdict is accepted as true, and the State must be given the benefit of all reasonable inferences that can be drawn from the evidence." *Id.* (quoting *Galloway v. State*, 122 So. 3d 614, 665 (¶168) (Miss. 2013)). "[I]f any rational trier of fact could have found each and every elements of the crime beyond a reasonable doubt, when viewing the evidence in the light most favorable to the prosecution, the verdict must stand." *Smith v. State*, 250 So. 3d 421, 424 (¶12) (Miss. 2018) (quoting *Cowart v. State*, 178 So. 3d 651, 666 (¶41) (Miss. 2015)).

### A.    Attempted Accessory After the Fact for Capital Murder

¶17.    Under Mississippi Code Annotated section 97-1-5, "[t]he elements of accessory after the fact are that (1) a completed felony has been committed; (2) the accused concealed, received, relieved, aided or assisted a felon, knowing that such person had committed a

8

felony; and (3) such assistance or aid was rendered with the intent to enable such felon to escape or avoid arrest, trial, conviction or punishment after the commission of such felony." *Mangum v. State*, 762 So. 2d 337, 342-43 (¶16) (Miss. 2000). Section 97-1-7(1) provides for the punishment of attempt:

> Every person who shall design and endeavor to commit an offense, and shall do any overt act toward the commission thereof, but shall fail therein, or shall be prevented from committing the same, on conviction thereof, shall where no other specific provision is made by law for the punishment of the attempt, be punished by imprisonment and fine for a period and for an amount not greater than is prescribed for the actual commission of the offense so attempted.

"Hence, courts interpret 'attempt' to mean the intent to do something, and some actual effort to put the intent into effect." *Carter v. State*, 932 So. 2d 850, 853 (¶6) (Miss. Ct. App. 2006) (quoting *Murray v. State*, 403 So. 2d 149, 152 (Miss. 1981)). "The 'gravamen' of the offense of an attempt to commit a crime is found in the statutory requirement that an overt act toward the crime be committed and the defendant be prevented from its consummation." *Id.* (quoting *State v. Lindsey*, 202 Miss. 896, 899, 32 So. 2d 876, 877 (1947)). Although each case must stand on its own particular facts, it is well-recognized that "whenever the design of a person to commit crime is clearly shown, slight acts done in furtherance of this design will constitute an attempt." *Williams v. State*, 48 So. 2d 598, 599-600 (Miss. 1950).

¶18. Here, Banks committed the felony of capital murder by shooting and killing two police officers. Thus, we ask whether any rational juror could find that Calloway committed an overt act intended to help Banks escape. In her indictment, Calloway was charged with the overt act of yelling repeatedly for Banks to get in her vehicle.

¶19. The jury observed and listened to the videos from Officer Tate's dash camera and

9

Calloway's interview with Master Sergeant Weeks. In Calloway's interview with Master Sergeant Weeks, she admitted that after Officer Tate stopped her vehicle, Banks stated "we ain't going to jail." And in her written statement given during her interview with Master Sergeant Weeks, Calloway, referring to Banks as "Cuz," stated that Banks "display[ed] a gun from his waistline" and voiced that "he was going to kill the motherf*****rs." The jury observed that after Banks shot at Officer Tate, Calloway jumped in her car, paused momentarily while her car's break lights lit up, and yelled, "Marvin, get in, Marvin, Marvin," before driving away.

¶20. The jury was appropriately instructed on the law concerning this issue. Jury Instruction S-1 instructed the jury to find Calloway guilty if it found, in addition to the other elements of attempted accessory after the fact, that Calloway committed an overt act toward an attempt to aid Banks. Conversely, Instruction S-8 told the jury to find Calloway not guilty if it found Calloway "freely and voluntarily abandoned her intent to commit the crime of Accessory After the Fact to Capital Murder before . . . perform[ing] any overt act toward the commission of [the] crime . . . ." With these instructions before it, the jury found Calloway's actions and statement to Banks satisfied the overt act required for her conviction.[6] We find, giving the State the benefit of all inferences reasonably drawn from the evidence, a rational

---

[6] The separate opinion cites *White v. State*, 851 So. 2d 400, 404 (¶10) (Miss. Ct. App. 2003), for the proposition that the existence of an overt act in this case is an issue of law. We disagree given there was conflicting evidence as to whether Calloway voluntarily abandoned her attempt to aid Banks. Thus, the evidence sufficiently raised a factual issue for the jury's determination. *See Ross v. State*, 601 So. 2d 872, 875 (Miss. 1992) (finding the evidence did not sufficiently establish a question of fact where the evidence *uncontrovertibly* showed the defendant abandoned the attempt).

10

juror could have found Calloway intentionally attempted to help Banks escape, but failed in her attempt when Banks did not respond to her urging.

¶21.   Notably, Calloway knew that Banks had a gun; she heard Banks express wanting to avoid jail; and she heard him say that he planned on killing the officers.  When Banks followed through on his intentions, Calloway—rather than immediately leaving the scene—stayed to offer Banks a means of escape.  Thereafter, Calloway gave a false description of Banks to law enforcement and maintained that she did know Banks's name or whereabouts.  The jury could infer from this evidence that Calloway was intent on helping Banks resist apprehension and only drove away from the scene of the shooting when Banks did not respond.  Calloway's pause for Banks was brief, but the evidence is such that, when considered under our familiar standard of review, we have no authority to disturb the jury's finding that the prosecution proved each and every element of the offense of attempted accessory after the fact to capital murder.

### B.     Hindering the Prosecution in the First Degree

¶22.   Under Mississippi Code Annotated section 97-9-103(1), "[a] person commits the crime of hindering prosecution in the first degree if, with the intent to hinder the apprehension, prosecution, conviction or punishment of another for conduct constituting a felony, he renders criminal assistance to the other person."

¶23.   Here, the evidence reflects that Calloway misrepresented the nature of her relationship with Banks during her interview with Master Sergeant Weeks.  As Thomas's testimony reflected, Calloway was dating Banks, knew his name, and had stayed with him three to four

11

days each week over a period of six months. Nevertheless, during her multiple interviews with law enforcement officers, Calloway identified Banks only as "Cuz," claiming that he was a friend of her friend, "Loco," whom she bought marijuana from. Calloway explicitly told the officers that she did not know either man's real name. When Smith asked what Banks was wearing, Calloway misidentified his attire. And when Lieutenant Myers-Mitchell showed Calloway a photo lineup of suspects, Calloway identified Banks by nickname only, writing that he "looked like the passenger in [her] car." Calloway finally began using Banks's name after Master Sergeant Weeks disclosed that law enforcement knew of him—she did so after five hours had passed since Officer Dean's and Tate's murders.

¶24. In viewing the evidence in the light most favorable to the State, a rational juror could conclude that Calloway misrepresented her knowledge concerning Banks with the intent to delay Banks's apprehension, thereby rendering him criminal assistance. We thus hold that the evidence was sufficient to support Calloway's conviction for hindering the prosecution in the first degree.

## II. Cumulative Error

¶25. Calloway argues that reversal is warranted under our cumulative error doctrine, which holds that "while harmless error in and of itself is not reversible, where more than one harmless error occurs at the trial level, those errors may have the cumulative effect of depriving a defendant of a fair trial." *Wilson v. State*, 21 So. 3d 572, 591 (¶58) (Miss. 2009). Calloway claims that the prosecution repeatedly misquoted her statement, "Marvin, get in, Marvin, Marvin," which prejudiced the jury and wrongfully impacted the trial. Calloway

12

contends that the trial judge should have declared a mistrial sua sponte because the prosecution's continued use of her statement prejudiced the jury and wrongfully impacted the trial.

¶26. In reviewing the record, we note that Calloway did not object each time that the prosecution and the State's witnesses misquoted her statement. *See Havard v. State*, 928 So. 2d 771, 791 (¶34) (Miss. 2006) (holding that the failure to object operates as a waiver on appeal). Nevertheless, we do not find that the misquotes were so prejudicial as to warrant reversal. Calloway's complaint hinges on the State's representations that she said "get in the car," as opposed to "get in." The jury watched Officer Tate's dash-camera video and heard the correct version of Calloway's statement. We find the State's misquotes harmless under the circumstances and find no cumulative error.

### III. Sentence for Attempted Accessory After the Fact

¶27. Calloway also claims that her sentence for attempted accessory after the fact of capital murder is unconstitutionally disproportionate and excessive. Because Calloway failed to attack the constitutionality of her sentence at her sentencing hearing and in her motion for a JNOV or new trial, it is procedurally barred from our consideration. *Sims v. State*, 928 So. 2d 984, 988 (¶21) (Miss. Ct. App. 2006). Notwithstanding the procedural bar, we will review this issue.

¶28. Prison sentences are within the trial court's sole discretion, and generally we will not disturb a prisoner's sentence on appeal when it falls within statutory guidelines. *Moseley v. State*, 104 So. 3d 839, 841 (¶8) (Miss. 2012). "However, if the sentence is grossly

disproportionate to the crime committed, the sentence triggers the Eighth Amendment's protection against cruel and unusual punishment." *Moody v. State*, 964 So. 2d 564, 567 (¶13) (Miss. Ct. App. 2007).

¶29. In *Solem v. Helm*, 463 U.S. 277, 290-92 (1983), the United States Supreme Court established a three-prong analysis to objectively identify a disproportionate sentence. These prongs include: (1) the gravity of the crimes and harshness of the penalties, (2) other criminals' sentences in the same jurisdiction for the same crimes, and (3) sentences other jurisdictions impose for commission of the same crime. This analysis, however, is only applicable "where a threshold comparison of the crime committed to the sentence imposed leads to an inference of gross disproportionality." *Moody*, 964 So. 2d at 567 (¶15).

¶30. Here, Calloway failed to make a threshold comparison of the crime committed to the sentence imposed. She refers to multiple cases in which the defendants were sentenced for forgery, stealing steaks, false pretenses, and transfer of a controlled substance. *See Rummel v. Estelle*, 445 U.S. 263, 267 (1980); *see also Bell v. State*, 724 So. 2d 342 (Miss. 1998); *Clowers v. State*, 522 So. 2d 762, 764 (Miss. 1988); *Presley v. State*, 474 So. 2d 612 (Miss. 1985). Yet the crime Calloway committed was far more grave—she attempted to help Banks escape after he shot and killed two police officers. Calloway's sentence of twenty years clearly falls within the statutory limit. *See* Miss. Code Ann. §§ 97-1-5 & -7(1). We find that Calloway has failed to establish the requisite inference of gross disproportionality that would lead to a *Solem* analysis. Therefore, we find that the trial court did not abuse its discretion in sentencing Calloway to twenty years in the custody of the MDOC for attempted accessory

14

after the fact.

## CONCLUSION

¶31.   We find the evidence sufficient to support Calloway's convictions for attempted accessory after the fact of capital murder and hindering the prosecution in the first degree. Further, Calloway's sentence for attempted accessory after the fact does not create an inference of gross disproportionality that would merit a *Solem* analysis under the Eighth Amendment. We affirm Calloway's convictions and sentences, finding no cumulative error at the trial level.

¶32.   **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., LAWRENCE AND C. WILSON, JJ., CONCUR. WESTSBROOKS, TINDELL AND McDONALD, JJ., CONCUR IN PART AND DISSENT IN PART WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, TINDELL AND McDONALD, JJ.**

**McCARTY, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶33.   I concur with the majority's affirmance of Calloway's conviction and sentence for hindering Banks's prosecution. Based upon Mississippi precedent and the video evidence in this case, as a matter of law there was insufficient evidence to convict Calloway of attempted accessory after the fact. As a result, I believe that we should reverse and render Calloway's conviction and sentence for being an "attempted accessory after the fact." I therefore respectfully concur in part and dissent in part from the majority's opinion.

¶34.   I have found only one other Mississippi case where our appellate courts have considered a conviction for attempted accessory after the fact. *See White v. State*, 851 So.

15

2d 400, 404-05 (¶10) (Miss. Ct. App. 2003) (reversing the defendant's conviction and sentence and remanding the case based upon the indictment's failure to state the required "overt act" the defendant committed in furtherance of the attempted crime). In *White*'s split decision, the dissent cited a Florida case, *Bush v. State*, 359 So. 2d 556 (Fla. Dist. Ct. App. 1978), to support its position that, based upon both the attempt and accessory statutes' requirement of an overt act, no such crime as attempted accessory after the fact exists.[7] *White*, 851 So. 2d at 407-08 (¶¶21, 23) (King, P.J., dissenting). While the majority in *White* reached a different conclusion as to that issue, it held back on determining whether the crime even existed as a matter of law. *Id.* at 404-05 (¶10).

¶35. As the majority recounts, on May 9, 2015, at approximately 7:40 p.m., police stopped Calloway's vehicle during a routine traffic stop. In addition to Calloway, the car held three passengers: Calloway's boyfriend, Banks, who sat in the front passenger seat; a friend named "Loco"; and Calloway's toddler son. The dash camera footage from one of the police cruisers showed that two officers ordered Calloway and Banks to exit the car. Although Calloway and Banks complied with the order, Banks then reached back into the car and pulled out a gun. He fatally shot both officers offscreen. During the shooting, Calloway jumped back into the car. She held her foot on the break and yelled, "Marvin, get in, Marvin, Marvin." She then drove away, leaving Banks behind.

¶36. Beginning 7 minutes and 44 seconds into the video, the sequence and timing of events

---

[7] While the accessory statute does not specifically state that an overt act is required, the dissent in *White* nevertheless stated that the "statute clearly requires the commission of an overt act for conviction as an accessory-after-the-fact." *White*, 851 So. 2d at 407 (¶18) (King, P.J., dissenting).

16

occurred as follows:

| | |
|---|---|
| 7 min. 44 sec.: | Banks fires the first shot at approximately 7:46 p.m. |
| 7 min. 47 sec.: | Calloway gets back into the driver's seat; 5 shots have been fired. |
| 7 min. 48 sec.: | The brake light on Calloway's car engages. |
| 7 min. 49 sec.: | Calloway can be heard yelling, "Marvin, get in, Marvin, Marvin." |
| 7 min. 52 sec.: | Banks fires a sixth shot, and Calloway drives away without him. |
| 8 min. 06 sec.: | Banks fires his seventh and final shot. |
| 8 min. 09 sec.: | Banks departs in one of the police cruisers. |

¶37. Shortly after departing the scene, Calloway stopped a half mile away at a local festival. Melissa Chambliss provided a statement to police that a woman "came running into the crowd screaming that her boyfriend had just killed two cops." Goff, who was also present at the festival, told Calloway that she was going to call the police, to which Calloway responded, "[Y]es[,] and an ambulance." Goff made a 911 call at 7:57 p.m. Later, when police questioned Calloway, she initially denied knowing Banks and claimed that she just picked up two random individuals while looking to purchase weed. After several hours, she advised police that the shooter was in fact Banks.

¶38. Mississippi Code Annotated section 97-1-5 (Rev. 2014) requires the following elements for an accessory-after-the-fact offense:

(1) a completed felony has been committed; (2) the accused concealed, received, relieved, aided, or assisted a felon, knowing that such person had committed a felony; and (3) such assistance or aid was rendered with the intent

17

to enable such felon to escape or avoid arrest, trial, conviction[,] or punishment after the commission of such felony.

*Mangum v. State*, 762 So. 2d 337, 342-43 (¶16) (Miss. 2000).

¶39. With regard to attempt, Mississippi Code Annotated section 97-1-7(1) (Rev. 2014) states:

Every person who shall design and endeavor to commit an offense, and shall do any overt act toward the commission thereof, but shall fail therein, or shall be prevented from committing the same, on conviction thereof, shall where no other specific provision is made by law for the punishment of the attempt, be punished by imprisonment and fine for a period and for an amount not greater than is prescribed for the actual commission of the offense so attempted.

¶40. "[T]he mere intention to commit a crime is not punishable" because the intention must "be coupled with an overt act" in furtherance of the result. *Bucklew v. State*, 206 So. 2d 200, 202 (Miss. 1968). In addition, to constitute an attempt, the act in question must go beyond mere preparation or planning such that the act gives the defendant the "power to commit the offense[,] and nothing but an interruption [would] prevent[] the commission of the offense . . . ." *Id.* at 202-03. "[A] defendant's voluntary abandonment may negate a crime of attempt." *Ross v. State*, 601 So. 2d 872, 874 (Miss. 1992). This especially holds true where the defendant freely and voluntarily abandons an attempt to commit a crime before reaching the final action in the process. *Bucklew*, 206 So. 2d at 204.

¶41. In *Ross*, the Mississippi Supreme Court reversed the defendant's conviction for attempted rape after finding the defendant freely and voluntarily abandoned the attempt. *Id.* at 875. According to the supreme court, the "key inquiry" focused on the subjective question of "what made Ross leave?" *Id.* In answer to this inquiry, the *Ross* court found the

18

undisputed evidence showed that Ross did not fail in his attack due to some outside interference but that he voluntarily left "because he responded sympathetically to the victim's statement that she had a little girl." *Id.*

¶42.    In light of cases such as *White*, *Bucklew*, and *Ross*, I find that, as a matter of law, Calloway's statement, "Marvin, get in, Marvin, Marvin[,]" and her three-second wait before leaving the scene failed to constitute the overt acts required in furtherance of a definitely formed intention to aid Banks in escaping arrest.[8]  The undisputed evidence instead shows that Calloway, due to no external intervention, voluntarily left the scene as Banks continued to fire his weapon rather than continuing to wait for him to re-enter her vehicle.  She freely abandoned any conduct that, at most, might have constituted mere preparation or planning. In addition, she did so well before reaching any final act of completion in the process.  And as our caselaw firmly establishes, such conduct fails to constitute an attempt.

¶43.    In *Bucklew*, the supreme court noted "that the law, like religion, holds out a promise to those who would commit crime and sin that[,] if they voluntarily resist temptation so as to recant and desist before attempting to carry into effect their evil purpose, they will not be held accountable for mere evil intent."  *Bucklew*, 206 So. 2d at 204.  Arguably, Calloway momentarily contemplated assisting Banks.  The undisputed evidence establishes, however, that she voluntarily abandoned any such thought after a three-second period.  In light of relevant caselaw, I find such evidence insufficient to sustain Calloway's conviction and

---

[8] *Cf. Smith v. State*, 279 So. 2d 652, 653 (Miss. 1973) (finding that, without more, the defendant's statement to a third party, which directed the third party to tell a juror there might be a future reward, failed to constitute an overt act necessary for attempt to commit bribery).

sentence for attempted accessory after the fact.  Accordingly, I concur in part and dissent in part from the majority.

**WESTBROOKS, TINDELL AND McDONALD, JJ., JOIN THIS OPINION.**